UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JASON Z.,[1] | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) Case No. 3:23-cv-30050-KAR |
| | ) |
| MARTIN O'MALLEY, | ) |
| Commissioner of Social | ) |
| Security Administration,[2] | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION
FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION
FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER
(Docket Nos. 12 & 15)

ROBERTSON, U.S.M.J.

Jason Z. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner denying her[3] application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff seeks remand based on the sole contention that the ALJ erred by relying on mild to normal mental status examination results in finding her not disabled. Before the court are Plaintiff's motion for judgment on the pleadings (Dkt. No. 12), and the Commissioner's motion for an order affirming the decision (Dkt. No. 15). The parties have consented to this court's jurisdiction (Dkt. No. 9).

---

[1] In the interest of privacy, this Memorandum and Order uses only the first name and first initial of the last name of the non-governmental party in this case.

[2] Pursuant to Fed. R. Civ. P. 25(d), Martin O'Malley, Commissioner of the Social Security Administration, is substituted for Kilolo Kijakazi, former Acting Commissioner.

[3] Plaintiff was assigned male at birth, and most of the medical records refer to Plaintiff using the masculine pronouns he/him/his. However, Plaintiff indicated at the administrative hearing that she uses she/her/hers pronouns. Accordingly, those are the pronouns this court uses throughout this opinion when referring to Plaintiff.

1

*See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons set forth below, the court DENIES Plaintiff's motion and GRANTS the Commissioner's motion.

I.  **RELEVANT FACTUAL BACKGROUND**[4]

A.  Medical Records

Plaintiff commenced mental health treatment at BestLife Emotional Health & Wellness Center ("BestLife") in September 2019, approximately one year and eight months before she alleges that she became disabled (A.R. at 1125-31).[5]  At the time, Plaintiff reported that she had bipolar disorder and gender identity disorder and was "working on" her abuse of alcohol (A.R. 1125).  Plaintiff indicated that she had been on the same medication – lorazepam – for anxiety for 15 years, which allowed her to "function well enough" (A.R. 1125).  While Plaintiff reported having an excellent memory and "near genius" IQ, she stated that she was finding it difficult to focus or concentrate and was experiencing feelings of pointlessness (A.R. 1128-29).  Alane Burgess, LMHC, diagnosed Plaintiff with unspecified depressive disorder, moderate alcohol abuse disorder in early or sustained remission, other specified anxiety disorder, and gender dysphoria.  She recommended that Plaintiff participate in weekly or bi-weekly counseling sessions (A.R. 1130).

On November 8, 2019, Plaintiff met with Ruben Montanez, APRN (A.R. 1136-39).  Plaintiff reported symptoms including loss of joy, insufficient or excessive sleep, feelings of emptiness, and excessive drinking (i.e., one liter of bourbon per week consumed in three sittings) (A.R. 1136).  Plaintiff was able to follow the interview, her judgment and insight were fair, her

---

[4] Because Plaintiff only challenges the ALJ's evaluation of the evidence regarding her mental impairments, the court limits its discussion of the evidence accordingly.
[5] All citations to "A.R." refer to the administrative record, which appears at docket number 8 of this case.  The page numbers were assigned by the Social Security Administration and appear in the lower righthand corner of each page.

fund of knowledge was good, and her memory was intact (A.R. 1137-38). Montanez noted that Plaintiff was not responding well to Abilify and discontinued Abilify and imipramine and added Latuda 20 mg (A.R. 1138-39).

Plaintiff saw Montanez again on December 6, 2019 (A.R. 1140-1143). At this time, Plaintiff had discontinued taking Abilify, decreased imipramine, and started Latuda a week earlier. Plaintiff reported feeling sad and unmotivated and was still drinking alcohol (A.R. 1140). While Plaintiff's speech was less spontaneous, slow, and soft, and her thought processes slow, her memory and fund of knowledge were intact and her attention was good (A.R. 1141).

On January 7, 2020, Plaintiff saw Alex Altamirano, M.D., for a psychiatric examination (A.R. 1144-46). Plaintiff's mood was dysphoric, but her judgment, insight, and concentration were fair, her memory intact, and her language normal (A.R. 1144). Dr. Altamirano prescribed Plaintiff Ambien as needed at bedtime and increased her dose of Latuda to 40 mg. (A.R. 1145). Plaintiff followed up with Dr. Altamirano on February 18, 2020, after a hospitalization for an exacerbation of Crohn's disease (1147-51). Plaintiff reported that she had to quit her job and was more anxious than usual (A.R. 1147). According to Plaintiff, Ambien was not working to help her sleep, and she was using marijuana instead (A.R. 1147). On examination, Plaintiff's mood was dysphoric, but her thought processes were normal, her judgment, insight, and attention fair, and her memory intact (A.R. 1148-49). Dr. Altamirano discontinued Ambien and added Ativan as needed for severe anxiety (A.R. 1150).

Plaintiff was seen by Raju Panta, M.D., at Baystate Endocrinology & Diabetes on March 13, 2020, for an initial evaluation for estrogen therapy for gender dysphoria. Plaintiff reported that her psychiatrist recommended "micro-estrogen therapy" to help with mental health, and Dr.

3

Panta requested her psychiatric records (A.R. 1119-20).  Plaintiff began estrogen therapy in May 2020 (A.R. 1117-18).

On April 3, 2020, Plaintiff met with Emily Moccio, PA-C, at which time Plaintiff reported continued anxiety due, at least in part, to the COVID-19 pandemic (A.R. 1152-56). Plaintiff reported that the increased dosage of Latuda was making some difference and that, while she rarely took Ativan, it was effective when she did (A.R. 1153).  Moccio noted that Plaintiff's mood was dysphoric and anxious, but her memory was intact, her attention appropriate, and her judgment and insight were fair (A.R. 1154).  Plaintiff did not wish to make any changes to her medications (A.R. 1155).

Dr. Altamirano saw Plaintiff on May 12, 2020 (A.R. 1157-61).  Plaintiff indicated she was doing "fine" and that her mood was "much better" since starting hormone therapy (A.R. 1157-58).  Results of Plaintiff's mental status examination were unchanged (A.R. 1158-59). Plaintiff returned for a follow-up with Dr. Altamirano on July 21, 2020, and she continued to report a much better mood accompanying a higher dose of hormones, but Plaintiff was experiencing poor sleep and was self-medicating with alcohol  (A.R. 1162-66).  Dr. Altamirano reduced Plaintiff's Wellbutrin with a plan to discontinue it at the next visit and added trazadone as needed (A.R. 1165).  On October 11, 2020, Plaintiff continued to report poor sleep and advised that trazadone was not helping (1167-71).  Dr. Altamirano increased Plaintiff's dosages of trazadone and imipramine (A.R. 1170).  However, as of December 1, 2020, when Plaintiff next saw Dr. Altamirano, Plaintiff was still suffering from poor sleep, specifically an inability to fall asleep, prompting Dr. Altamirano to add Ambien for insomnia  (A.R. 1177-81).  When Plaintiff saw Dr. Altamirano on March 2, 2021, she reported feeling more dysphoric, and Dr.

Altamirano increased her dosage of imipramine to a therapeutic level based on her weight of over 500 pounds (1182-86).

On May 12, 2021, the day Plaintiff alleges that she became disabled, she saw Abel Gonzalez, M.D., in the wake of Dr. Altamirano's departure from BestLife (A.R. 1187-1192).  At that time, Plaintiff's primary concern continued to be difficulty falling asleep and maintaining sleep, for which she sometimes drank alcohol or used cannabis (A.R. 1187-88).  Indeed, although Plaintiff's anxiety had not improved since starting estrogen treatment for her gender dysphoria, she reported a stable and mostly euthymic mood (A.R. 1188).  Dr. Gonzalez observed Plaintiff's thought processes to be normal, her associations to be within normal limits, her judgment and insight to be fair, her memory to be grossly intact, and her attention/concentration to be good (A.R. 1189).  To try to address the continuing sleep problems, Dr. Gonzalez discontinued Ambien and added Lunesta (A.R. 1190).

Plaintiff returned to Dr. Gonzalez on June 30, 2021, at which time she reported continued sleeping problems and an increase in depressive symptoms, including a lack of motivation and of enjoyment of the activities she previously found pleasurable, such as playing video games (A.R. 2326-30).  Plaintiff indicated that the Lunesta had been unhelpful and that she was drinking more due to her insomnia (A.R. 2326).  Plaintiff participated in the telehealth visit from Florida, where she and her girlfriend had driven to visit Plaintiff's mother (A.R. 2326).  On examination, Plaintiff was fairly groomed and made eye contact within normal limits, exhibited normal speech and thought processes, had grossly intact memory and good attention, and appeared in a so-so mood with a reactive affect (A.R. 2327).  Dr. Gonzalez increased Plaintiff's dose of Latuda to target her mood symptoms, discontinued Lunesta due to lack of efficacy, and started her on Rozerem for sleep (A.R. 2328).

Approximately two weeks later, on September 18, 2021, Plaintiff met with clinician Jessica Hernandez to complete an outpatient adult comprehensive assessment update (A.R. 2338-45). Plaintiff advised Hernandez that she had started hearing voices and noises, including singing, music playing, and speaking (A.R. 2338). In addition, Plaintiff reported increased stress due to her girlfriend having been hospitalized, which she identified as the reason her drinking had increased to the point that she was going through three liters of whiskey per week (A.R. 2338). In updating Plaintiff's assessed needs, Hernandez indicated that Plaintiff declined continuing treatment for anxiety because the estrogen treatment had greatly decreased her feelings of anxiety associated with her gender dysphoria (A.R. 2339). Plaintiff agreed to continuing weekly therapy to address her substance use and depression, including identifying two or three activities to engage in regularly to increase positive social interactions (A.R. 2341).

Tasha Preston, APRN, met with Plaintiff on October 12, 2021, at which time Plaintiff was continuing to experience symptoms of psychosis, including auditory hallucinations of women screaming, whispers, and a child's voice, which Plaintiff said began around the same time she had started taking Lunesta along with an increased dose of Latuda (A.R. 2346-53). Plaintiff also reported dysthymic moods and some anhedonia and apathy (A.R. 2347). On the other hand, Plaintiff said that she was able to enjoy some activities, was sleeping well with Lunesta and melatonin,[6] and was drinking alcohol less and only on the weekends (A.R. 2347). In addition, Preston observed plaintiff to be in a euthymic, stable mood with evident residual insight, and no psychosis could be elicited (A.R. 2351).

Finally, on February 15, 2022, Plaintiff met with Lindsey Robins, M.D., reporting that mirtazapine was helping her maintain sleep, but it was still taking two hours for her to fall asleep

---

[6] Plaintiff denied ever picking up her Rozerem prescription from the pharmacy (A.R. 2347).

6

(A.R. 2517-223). Before receiving her mirtazapine prescription, Plaintiff was "abusing" her Ativan prescription by taking it to help her sleep (A.R. 2518). While Plaintiff denied a significant change in her mood, her primary concern was lack of sleep (A,R. 2518). Plaintiff had been taking Haldol, but it had been discontinued after her last visit, and she was hearing sounds and voices again at night (A.R. 2518). The results of Plaintiff's mental status exam were largely unchanged (A.R. 2519-20). Dr. Robins added Caplyta, continued Remeron and Lamictal, tapered imipramine, and restarted Haldol for Plaintiff's bipolar II disorder; continued Remeron and Lunesta for insomnia; and continued Ativan for anxiety (A.R. 2520-21).

      B.      <u>State Agency Consultants</u>

On initial review of Plaintiff's application, state agency psychologist Joanne Coyle, Ph. D., reviewed Plaintiff's medical records and completed a residual functional capacity ("RFC") assessment in August 2021 (A.R. 218-26). Dr. Coyle found that Plaintiff had severe mental disorders, including depressive, bipolar, and related disorders, as well as anxiety and obsessive-compulsive disorders. Dr. Coyle opined that Plaintiff had no limitation in the ability to understand, remember, and apply information, mild limitation in the ability to interact with others and concentrate, persist, or maintain pace, and moderate limitation in the ability to adapt or manage herself (A.R. 221). Based on her review of Plaintiff's records, Dr. Coyle concluded that "[claimant's] statements regarding the nature of h[er] psych [symptoms] are supported to a mild to moderate degree of impairment. [She] has shown some improvement with meds and estrogen treatment. [She] continues to experience some psych related dysfunction, but nothing that is more than moderately limiting" (A.R. 222). In assessing Plaintiff's mental RFC, Dr. Coyle opined that Plaintiff is moderately limited in the ability to respond appropriately to changes in the work setting but not significantly limited in the ability to be aware of normal

hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independent of others (A.R. 224).

On reevaluation, Kenneth Higgins, Ph. D., found the same severe mental impairments with no limitation in the ability to understand, remember, or apply information, but moderate limitation in the ability to interact with others, to concentrate, persist, or maintain pace, and to adapt or manage herself (A.R. 238-46).  Regarding Plaintiff's RFC, Dr. Higgins concluded that Plaintiff would have a reduction in cognitive efficiency with retained capacity for routine task completion for full-time work.  While Plaintiff reported some reduction in social engagement, Plaintiff could still interact appropriately when necessary.  Finally, notwithstanding Plaintiff's moderately limited ability to respond to changes in the work setting, she could adapt to minor changes in routine (A.R. 244).

    C.  <u>The Administrative Hearing</u>

        1.  *Plaintiff's Testimony*

At the hearing, Plaintiff testified that she quit working in May 2021, when her seasonal tax preparer job came to an end.  Plaintiff's manager was unwilling to offer her a permanent position because of Plaintiff's lack of reliability, which Plaintiff indicated was due to her having had to call out of work or leave work early too many times owing to her multiple health issues.  Specifically, Plaintiff testified that she would have to leave work and go home if the insulin pump that she uses as a result of her diabetes ran out in order to refill it, that she would have to go running to the bathroom excessively to void or vomit due to her Crohn's disease or gastroparesis, and that, as a result of either of those two issues, she would be too exhausted to continue working or would simply not feel up to it (A.R. 153).

Plaintiff first elaborated on the symptoms of her Crohn's disease. According to Plaintiff, she has blood in her stool and sometimes loses enough blood to cause her to become anemic. She finds the loss of blood physically exhausting. Plaintiff stated that, at times, she will pass blood clots the size of a golf ball, which requires treatment with IV steroids in the hospital. She also experiences cramping, stabbing pains in her intestines, and diarrhea to the extent that she cannot go out of range of a bathroom (A.R. 154). Plaintiff explained that the symptoms of her Crohn's disease can be unpredictable, but when it is active, she will have to be in the bathroom for ten to fifteen minutes at a time (A.R. 153). The pain she experiences also comes and goes (A.R. 156). Plaintiff takes two medications for Crohn's disease, Stelara and budesonide (A.R. 154-55). Plaintiff is also supposed to follow a fairly strict diet, which calls for avoiding spicy foods, alcohol, fats, nuts, and berries, among other things (A.R. 155).

Moving on to her diabetes, Plaintiff testified that she injects long-lasting insulin every night and uses a disposable insulin pump during the day as needed (A.R. 156). Plaintiff relies on a continuous glucose monitor so that she knows if her levels become too high or too low (A.R. 156-57). Plaintiff also suffers from diabetic gastroparesis, which leads to vomiting three or four times per week, usually followed by chills and exhaustion (A.R. 157-58). Plaintiff tries to follow the prescribed diets for her conditions but indicated that the diets are so restrictive it is difficult to remember all the foods that she is not supposed to eat (A.R. 158).

Regarding her mental health, Plaintiff explained that during the manic periods that accompany her bipolar disorder, she loses focus on the future and only worries about the present, which has caused her to make poor choices, including financially. On the other hand, during low periods, she stops caring about anything and does not groom herself adequately and withdraws socially (A.R. 159). Plaintiff testified that her generalized anxiety makes it difficult for her to sit

still for more than an hour and prevents her from being able to focus on anything (A.R. 158-59). The anxiety she experiences due to her gender dysphoria renders her completely useless for anything; for two to three days at a time, all she can do is dwell on the feeling of being in the wrong body (A.R. 160). Plaintiff also has auditory hallucinations, usually at night or in the morning, including voices and music (A.R. 161-62). Plaintiff indicated that lorazepam provides some relief from the anxiety, but it leaves her groggy and all she can do is lie down after taking it (A.R. 160). Plaintiff reported seeing a therapist bi-weekly and a psychiatrist monthly, as well as taking a mood stabilizer, an antidepressant, an antipsychotic, and estrogen (A.R. 160-61).

Plaintiff also suffers from sleep difficulties. On occasion, the voices she hears prevent her from falling asleep. In addition, her various medications cause insomnia, and it takes her two or three hours to fall asleep at night (A.R. 162). Plaintiff has sleep apnea, for which she uses a CPAP machine. Because of all of her health issues, Plaintiff requires between twelve and thirteen hours of sleep per night, and if she does not get enough sleep, she will fall back asleep within two or three hours of waking up. Plaintiff reported difficulty remembering things and uses reminders on her phone to take her medications (A.R. 163). Plaintiff also described her practice of identifying one or two tasks to complete per day but indicated that she is only able to meet that goal about fifty percent of the time (A.R. 164-65).

2. *Vocational Expert's Testimony*

When the vocational expert testified at the hearing, the ALJ first asked her to consider a hypothetical individual of Plaintiff's age, education, and work experience, who could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for a total of six hours, sit for a total of six hours, engage in only occasional postural activities (including climbing, balancing, stooping, kneeling, crouching, and crawling), frequently finger and handle

with the left extremity, and tolerate occasional workplace changes, but must avoid concentrated exposure to vibration, hazards, or fumes, odors, dusts, gasses, and other pulmonary irritants, be limited to simple and routine tasks, and have no more than occasional contact with supervisors, coworkers, and members of the public (A.R. 166).  The vocational expert testified that these limitations would eliminate Plaintiff's past work, but that there are jobs in the national economy such a person could do, including shipping and receiving weigher, router, and small products assembler (A.R. 166-67).  The ALJ then asked the vocational expert to consider the same hypothetical individual but with the ability to stand and walk reduced to two hours total per workday (A.R. 167).  The vocational expert indicated that there would be some reduction in the numbers of router and products assembler positions with s sit/stand option but that there would still be positions and that there would also be positions as a marker or laborer (A.R. 167-68).  Finally, the vocational expert testified that all work would be eliminated if the hypothetical individual would be off task 15% of the time or miss work on average two days per month (A.R. 168-69).

II.  **THE ALJ'S DECISION**

On May 4, 2022, the ALJ issued a decision denying Plaintiff's claims (A.R. 74-94).  The ALJ conducted the requisite five-step sequential analysis set forth in the regulations promulgated by the SSA.  *See* 20 C.F.R. § 404.1520(a)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v). At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of May 12, 2021 (A.R. 58).  At the second step, he found that Plaintiff's severe impairments included diabetic gastroparesis, diabetes mellitus, Crohn's disease, hypothyroidism, microalbuminuria, asthma, obstructive sleep apnea, morbid obesity, bipolar disorder, depressive disorder, anxiety disorder, gender identity disorder, and alcohol abuse (A.R. 79-80).  At step

three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment (A.R. 80). Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567 (b) and 416.967(b) except stand and walk 6 hours; sit 6 hours; and occasionally climb, balance, stoop, kneel, crouch, or crawl. The claimant must avoid concentrated exposure to extreme cold, vibration, hazards, and to fumes, odors, dusts, gases, and other pulmonary irritants. The claimant is limited to simple, routine tasks in a setting with no public contact. The claimant can adapt only to simple workplace changes.

(A.R. 82). At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work of a composite job with duties of tax preparer or office manager and security guard (A.R. 87). Finally, at step five, the ALJ found that Plaintiff could perform jobs found in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled (A.R. 88).

**III. ANALYSIS**

    A. <u>Standard of Review</u>

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'" *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)). The court reviews questions of law *de novo*, *id.*, but "the ALJ's findings [of fact] shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill,*

744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not."  *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee*, 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

> B. The ALJ Did Not Commit an Error of Law and His Evaluation of the Inconsistencies Between the Objective Medical Evidence and Plaintiff's Statements About Her Symptoms Is Supported by Substantial Evidence

On appeal, Plaintiff's sole claim of error is that the ALJ erroneously relied on "evidence demonstrating normalcy and stability" to determine that Plaintiff was not disabled by her severe mental impairments (Dkt. No. 20 at 16).  The two cases on which Plaintiff relies, *Morin v. Astrue*, Civil No. 10-cv-159-JL, 2011 WL 2200758 (D.N.H. June 6, 2011), and *Kohler v. Astrue*, 546 F.3d 260 (2d Cir. 2008), could support an argument that an ALJ errs when she or he interprets the term "stable" as "good" because a claimant can be stable at a low functional level.  Here, however, the ALJ did not rely on any purported stability in Plaintiff's condition in finding that Plaintiff could engage in substantial gainful activity.  *See Morin*, 2011 WL 2200758, at *8 (explaining that because a claimant can be stable at a low functional level, "a conclusion that a patient is 'stable' must be evaluated for  purposes of an RFC determination in the context of a

patient's entire medical record."); *Kohler*, 546 F.3d at 268 (noting that the term "stable" might mean only that a claimant's condition has not changed, and "she could be stable at a low functional level").  Instead, the ALJ noted that Plaintiff's mental status examinations "had largely mild to normal results" (A.R. 85), and mild to normal mental status examination results can constitute substantial evidence on which on ALJ may base a finding that a plaintiff's subjective complaints are inconsistent with the medical record and, thus, are not entirely credible.  *See Ferguson v. Berryhill*, No. 18-cv-11239-JDC, 2020 WL 210821, at *9 (D. Mass. Jan. 14, 2020) (finding that "normal" mental status findings, along with reports of improvement from treatment, constituted sufficient evidence for the ALJ to conclude that the plaintiff's statements regarding her limitations were inconsistent with the record).

Moreover, substantial evidence supports the ALJ's finding that Plaintiff's medically determinable mental impairments could reasonably be expected to cause her alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical and other evidence in the record (A.R. 84-85).  In other words, the record substantiates the ALJ's finding that Plaintiff's allegations had some support but were not entirely supported (A.R. 84).  The claimant testified at the hearing that she had trouble remembering things and needed reminders to take her medications (A.R. 163), but her mental status examinations consistently showed "normal associations, thought processes, memory, attention, and concentration" (A.R. 81 (citing A.R. 1189, 2327, 2332, 2348, 2519-20)).  This led the ALJ to conclude that Plaintiff had only mild limitation in understanding, remembering, and applying information (A.R. 81).  As to her ability to interact with others, Plaintiff testified that she would distance herself from others during depressive episodes (A.R. 159), but the ALJ noted that mental status examination results reflect that she appeared pleasant

and with normal eye contact and speech, supporting a moderate limitation (A.R. 81 (again citing A.R. 1189, 2327, 2332, 2348, 2519-20)).  Next Plaintiff testified that she was constantly exhausted and that her anxiety made her unable to sit still for more than an hour, focus, and complete tasks (A.R. 158-159), but, while her treatment records documented occasional complaints of lack of motivation, her mental status examination results again showed normal thought processes, memory, attention, and concentration (A.R. 81 (again citing A.R. 1189, 2327, 2332, 2348, 2519-20)).  The ALJ thus found that Plaintiff was moderately limited in her ability to concentrate, persist, and maintain pace (A.R. 81).  Finally, relative to Plaintiff's ability to adapt and manage herself, Plaintiff described making poor decisions during manic episodes, neglecting her hygiene and lacking motivation during depressive episodes, and experiencing auditory hallucinations usually at night or in the morning (A.R. 159, 161-162), complaints which were documented in her medical records.  The ALJ found that Plaintiff's testimony and her historical reports of her symptoms, in conjunction with mental status examination results rating Plaintiff's judgment and insight as fair, her grooming as fair on three occasions, and her thought content as normal with no evidence of psychosis, (A.R. 82 (again citing A.R. 1189, 2327, 2332, 2348, 2519-20)), supported a moderate limitation in the area of adapting and managing oneself (A.R. 82).  Thus, the ALJ's credibility assessment, which is entitled to considerable deference, *Anderson v. Astrue*, 682 F. Supp. 2d 89, 98 (D. Mass. 2010), is amply supported.

Going one step further, the ALJ's assessments of Plaintiff's mental health limitations are more restrictive or in harmony with those of the state agency physicians.  Both Drs. Coyle and Higgins opined that Plaintiff had no limitation in her ability to understand, remember, or apply information, while the ALJ found a more restrictive mild limitation.  The ALJ found Plaintiff to be moderately limited in her ability to interact with others and to concentrate, persist, and

maintain pace, which is more restrictive than Dr. Coyle's opinion that Plaintiff was mildly limited in these areas and in agreement with Dr. Higgins' opinion that she was moderately limited.  Finally, both Drs. Coyle and Higgins opined that Plaintiff is moderately limited in adapting and managing herself, which aligns with the ALJ's finding of moderate limitation.  Finally, the ALJ carried these findings into his RFC assessment, limiting Plaintiff to simple, routine tasks in a setting with no public contact and with the need to adapt to only simple workplace changes (A.R. 82).  Accordingly, the ALJ's decision is not appropriate for reversal.  *Chen v. Holder*, 703 F.3d 17, 21 (1st Cir. 2012) (explaining that reversal is appropriate under a substantial evidence standard "only if the record is such as to compel a reasonable factfinder to reach a contrary determination").

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. No. 12) is DENIED and the Commissioner's motion to affirm (Dkt. No. 15) is GRANTED.  The clerk is directed to close the case.

It is so ordered.

Date:  September 18, 2024         /s/ Katherine A. Robertson
                                  KATHERINE A. ROBERTSON
                                  U.S. MAGISTRATE JUDGE